IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CARMELLO D. WELLS,<br><br>Plaintiff,<br><br>v.<br><br>JESSICA CAMACHO;<br>KATRINA JULEEN FEWKES;<br>CINDY KROLIKOWSKI;<br>MARK LABOUCHARDIERE;<br>SHAYLEE FORTNER;<br>LUCAS JONES; and<br>THOMAS FOSTER,<br>each in an individual capacity,<br><br>Defendants. | Case No. ____________<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND JURY DEMAND**

Plaintiff Carmello D. Wells, through counsel, brings this Complaint against Defendants and alleges as follows:

**INTRODUCTION**

1. This case is about the repeated sexual abuse of children confined at Nebraska's Youth Rehabilitation and Treatment Center in Kearney, the culture that enabled that abuse, and officials who had many opportunities to stop it but utterly failed to protect the children in their care.

2. The State of Nebraska confined Plaintiff Carmello Wells at the Kearney facility in October 2023, when he was sixteen years old, and placed every aspect of his daily life under the control of state employees at Kearney. Two of those employees used that power and access to sexually abuse Carmello. The administrators and compliance officials responsible for Carmello's

safety received warning after warning about the danger. But rather than protect children, they dismissed the warnings, discredited Carmello, and left him within reach of his abusers.

3. Defendant Jessica Camacho, a staff member at Kearney, sexually abused Carmello during the first eighteen months he was confined there. She cultivated a secret relationship with him by giving him special attention, food, vapes, and a cellphone; promising him a life with her after his release; and teaching him how to hide their communications. She led him to camera blind spots and subjected him to sexual penetration and repeated sexual contact. She performed oral sex on him, grabbed and touched his penis, and engaged in sexual activity with him in a closet on several occasions. Defendant Katrina Fewkes, another staff member, reached through the opening in Carmello's locked cell door and touched his penis. Camacho and Fewkes could reach Carmello only because Nebraska had confined him and entrusted them with his care.

4. Carmello's abuse was part of a systemic failure to protect children at Kearney. After an investigation, the Nebraska Inspector General found that the facility's culture "normalized inappropriate staff behavior, which the facility failed to sufficiently address." The Inspector General documented 44 allegations of sexual abuse and related misconduct in a single year, comprising more than 200 specific claims by 37 youths against 19 staff members across every living unit and multiple other locations at Kearney. At least 11 of the 19 accused employees had already been disciplined, counseled, or named in prior sexual-abuse or boundary allegations. The Inspector General found evidence in personnel files and earlier investigations of the same patterns of misconduct extending back a decade. Four staff members, including Camacho and Fewkes, have been criminally charged.

5. Kearney's response to the children who reported abuse was to blame them and close the file. Staff and compliance officials repeatedly characterized youths in their care as manipulative, as initiators of inappropriate contact, or as liars seeking retaliation or release. Most officials interviewed by the Inspector General dismissed the accused employees as "a few bad apples" and resisted any conclusion that Kearney had a broader problem. Carmello experienced that permissive culture of abuse firsthand. After he reported Fewkes's sexual touching, investigators described him as having "an extensive pattern of making accusations." Kearney later punished him for reporting staff sexual misconduct and ordered him to write a paper about the harm caused by false accusations.

6. The officials named here did nothing to protect Carmello even as warnings about his abuse by Camacho and Fewkes became impossible to ignore. They knew within weeks of his arrival that Camacho had been accused of having sex with a detained youth. They received Carmello's report that Fewkes touched his penis. They later received a direct report that Camacho was having a sexual relationship with Carmello, supported by evidence of their unusual closeness, the time they spent together, gifts, and her admitted access to him. Defendants Jones and Foster still branded that allegation "UNFOUNDED," relying in part on body language and declining to interview the former youth identified as a source. No one protected Carmello from further contact with Camacho or Fewkes.

7. Within weeks, the evidence was sitting on a cellphone inside the facility. It contained 42 pages of messages and other evidence, 12 FaceTime calls over three days, sexually explicit photographs and videos, and Camacho's messages calling Carmello her "future hubby" and asking whether he would move in with her immediately after his release. When Carmello tried to tell staff about his relationship with Camacho, they called him manipulative and placed

him in confinement. Even after the phone was found, a review identifying Defendants Krolikowski and Jones reduced Camacho's conduct to "Staff-to-Youth Inappropriate Boundaries," found no opportunity for improvement, and declared that Kearney needed no change in policy or practice to prevent, detect, or respond to sexual abuse. Prosecutors have since charged Camacho with six felonies, including first- and second-degree sexual abuse based on sexual penetration of and sexual contact with Carmello. Fewkes was among four Kearney staff members criminally charged; her prosecution concerns the sexual abuse of another youth.

8. Kearney officials hid the abuse. They kept the evidence of Carmello's abuse from his probation officer, his lawyers, and the juvenile court at the hearing that determined where the State would confine him next. When the court finally learned of the abuse evidence Kearney had withheld, it ordered that Carmello not be returned there and wrote: "This Court is disgusted and disturbed as to the lack of transparency in this matter and cannot say that continued commitment to the YRTC at this time would be in Carmello's best interests." Carmello brings this action against Camacho and Fewkes for sexually abusing him and against the administrators and compliance officials whose deliberate disregard of repeated warnings allowed the abuse to continue. He seeks compensation for the injuries they inflicted and punitive damages for their conscious disregard of his rights.

**JURISDICTION AND VENUE**

9. This action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, with claims under the Eighth Amendment pleaded in the alternative. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2). The sexual abuse and the acts and omissions giving rise to Carmello's claims occurred at the state-operated Youth Rehabilitation and Treatment Center in Kearney, Nebraska ("YRTC-Kearney" or "Kearney").

Each Defendant worked in Nebraska and committed the acts or omissions alleged here in connection with that work.

**PARTIES**

11. Plaintiff Carmello D. Wells was born in 2007 and was sixteen when he arrived at Kearney in October 2023. He was committed through the Nebraska juvenile court and held for care, treatment, and rehabilitation. He has since been released from custody.

12. Defendant Jessica Camacho worked as a Youth Program Specialist at Kearney during the period of her abuse of Carmello. Her position gave her authority over detained youths and access to Carmello in the facility's living units and other areas.

13. Defendant Katrina Juleen Fewkes worked as a Youth Program Specialist at Kearney during the period of her abuse of Carmello. Her position gave her authority over detained youths and access to Carmello while he was confined in his cell.

14. Defendant Cindy Krolikowski was Kearney's Facility Administrator during the events alleged here. She supervised facility operations and had authority to restrict staff access to youths, take protective measures, and address reports of sexual abuse. She personally received and reviewed reports concerning Camacho and Fewkes.

15. Defendant Mark LaBouchardiere was the Administrator of the Office of Juvenile Services within the Nebraska Department of Health and Human Services ("DHHS"). He oversaw Kearney and had authority to direct its administration to protect youths from staff sexual abuse. He personally received reports concerning Camacho and Fewkes.

16. Defendant Shaylee Fortner served as a compliance manager and later as the facilities compliance administrator responsible for Kearney. She directed responses to reports of staff sexual abuse, coordinated with facility leadership, and reviewed and approved investigations, including the 2023 investigation of Camacho.

17. Defendant Lucas Jones served as a compliance specialist and later as compliance manager at Kearney. He investigated reports of staff sexual abuse, interviewed youths, communicated with facility leadership and outside agencies, and made findings and recommendations. He personally handled investigations concerning both Camacho and Fewkes.

18. Defendant Thomas Foster was a compliance official who participated in the February 2025 investigation of Camacho's conduct toward Carmello. He signed the investigation report closing the sexual-relationship allegation as unfounded.

19. Each Defendant acted under color of Nebraska law. Camacho and Fewkes used the access and authority their state employment conferred to commit the abuse alleged here. The remaining Defendants exercised state authority in administering the facility and responding to reports of abuse. All Defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### A. Carmello Arrived at Kearney and Depended on Staff for His Safety

20. Carmello arrived at Kearney on October 5, 2023, at age sixteen, following a juvenile-court commitment. He could not leave the facility or choose the adults responsible for his custody. Staff controlled his movement, assignments, privileges, and access to other people.

21. During part of his confinement, Carmello was housed in the Dickson Behavioral Stabilization Unit, where he was held separately from the facility's open living units. He depended on staff for access to the outside world and the ordinary activities of daily life.

22. Kearney's written policies prohibited sexual contact between staff and youths. They also prohibited conduct that facilitated abuse, including secret relationships, inappropriate personal disclosures, gifts, and unauthorized personal communications. These rules applied to Camacho and Fewkes and were part of the protections the administrators and compliance officials were responsible for enforcing.

**B. Camacho Began Grooming and Repeatedly Sexually Abusing Carmello Almost Immediately After His Arrival**

23. Defendant Jessica Camacho, a staff member at Kearney, began grooming and sexually abusing Carmello almost immediately after he arrived at Kearney. She used her position as a staff member to cultivate a secret sexual relationship with him. She gave him special attention, flirted with him, and supplied snacks and contraband, including vapes. She used those favors to gain his trust and draw him into increasingly sexual interactions.

24. Camacho exploited Carmello's isolation and dependence on facility staff. She presented herself as someone he could turn to with his problems and promised a romantic future outside the facility.

25. Over the course of the abuse, Camacho directed Carmello to places outside the surveillance cameras' view and instructed him how to hide the telephone from other staff. In those locations, she kissed him, grabbed his penis, and performed oral sex on him. She also touched his penis underneath a table. Camacho and Carmello entered the upstairs closet in the Lincoln Living Unit alone on several occasions and engaged in sexual activity there. Her sexual contact occurred during his confinement at Kearney, while he was a minor.

26. Carmello did not freely consent to Camacho's sexual acts. She used her custodial authority, his youth and dependence, the favors she controlled, and the emotional dependence she cultivated to obtain his submission and secrecy.

27. Camacho's conduct served her own sexual gratification. It had no treatment, rehabilitative, disciplinary, or other legitimate custodial purpose.

28. On October 27, 2023, Kearney compliance staff received an employee's report that Camacho was having sexual intercourse with a detained youth. The report also described

conversations involving Carmello about sexual activity with Camacho. The report identified Camacho by name.

29. Defendant Shaylee Fortner, a compliance official at Kearney, coordinated the response with Defendant Cindy Krolikowski, the Facility Administrator, and Defendant Mark LaBouchardiere, DHHS's Administrator of the Office of Juvenile Services, and notified them of the allegation. Defendant Lucas Jones, another Kearney compliance official, investigated. The facility's resulting incident review identified Krolikowski, Fortner, and Jones as the officials conducting the review on November 6, 2023. Krolikowski and Fortner signed that review the following day.

30. The officials closed the allegation as unfounded. Staff had known of the allegation for six days before reporting it to Compliance, and an employee had already alerted Camacho. The review called for prompt reporting and warned against sharing allegations with the potential perpetrator "to ensure safety of all parties." They knew that allegations of staff sexual activity were circulating among youths and employees and that the allegations involved a staff member who had access to Carmello.

**C. Fewkes Sexually Abused Carmello, and Officials Dismissed His Report**

31. Defendant Katrina Juleen Fewkes made sexual remarks to Carmello and used her access to him in the Dickson unit to engage in sexual touching. In January 2024, she reached through an opening in his cell door and touched his penis. On one occasion, she pretended to hand him a tissue while touching his penis through the opening.

32. On January 21, 2024, Carmello told a staff member, Jordan Orcutt, about Fewkes's conduct. He reported that Fewkes had touched his penis through the cell-door opening and had allowed him to touch her buttocks.

33. When Defendant Lucas Jones, another compliance official at Kearney, questioned him the next day, Carmello denied having made the report. Carmello feared punishment and retaliation if he disclosed staff sexual abuse.

34. In January 2024, Jones investigated Carmello's report about Fewkes. He interviewed Carmello before reporting the matter to the child-abuse hotline and characterized Carmello as having an extensive pattern of making accusations. The report was closed.

35. On January 23, 2024, Krolikowski received a written hotline notification of the allegation involving Fewkes and Carmello. LaBouchardiere was copied on that notification. They thus knew that Carmello had been identified as a potential victim of sexual touching by another member of the staff responsible for his custody. Fewkes continued to supervise Carmello after his January 2024 report. For example, on June 20, 2025, she and another staff member took him outside for recreation.

36. Fewkes's sexual touching was unwanted and an abuse of her custodial power over Carmello. It served no legitimate custodial purpose.

**D. Officials Left Camacho with Access to Carmello and Punished Him for Reporting Staff Misconduct**

37. The officials nevertheless continued to permit Camacho to work with Carmello. Krolikowski and LaBouchardiere did not use their authority to require restrictions that would prevent Camacho from obtaining private access to him. Fortner and Jones did not implement effective protective measures through their compliance responsibilities. The reports were treated as closed matters rather than warnings requiring continuing protection.

38. Camacho's conduct generated further warnings. In February 2024, a supervisor counseled her about physical boundaries with youths, including youths touching her chin and sitting too close to her.

39. In August 2024, the facility charged Carmello with falsely reporting staff sexual misconduct and ordered him to write a two-page paper about the effects of false reporting. Carmello disputed the violation and appealed. Krolikowski personally reviewed the disciplinary finding. Jones approved the investigation report recommending a false-reporting violation and referral to Carmello's treatment team for "further behavior modifications."

**E. The February 2025 Investigation Left Carmello Exposed to Camacho**

40. By February 2025, staff were discussing Camacho's practice of giving youths food and drinks, and she had been reprimanded for that conduct.

41. On February 14, 2025, staff member Synthia Griffith reported that Camacho was having a sexual relationship with Carmello. The report followed information communicated by another employee and a youth who had recently left the facility. Griffith had also seen Carmello wearing a bracelet bearing a "C" and hearts.

42. The investigation recorded additional concerns. Camacho and Carmello spent considerable time together. In a written statement witnessed by Defendant Thomas Foster, yet another Kearney compliance official, Griffith reported that another employee, Ismael Perez, had seen Carmello and Camacho "move away from each other very fast" when he entered the unit. Staff had discussed Camacho's provision of food and drinks to youths, and Camacho acknowledged giving them meal trays and drink packets.

43. The investigation also established Camacho's continuing access to Carmello. She was frequently assigned to work with a group of youths that included him, including on deliveries, yard work, and trips to the gym. She told investigators that Carmello followed her because he did not like other staff members.

44. Jones and Foster's February 21, 2025 investigation report classified the allegation of a sexual relationship as "UNFOUNDED." Their conclusion relied in part on their assessment

that Camacho's and Carmello's manner of speaking and body language did not indicate deception.

45. Jones and Foster did not interview the discharged youth identified as a source of the allegation. They treated that youth's departure from the facility as a reason not to conduct the interview. The video review described in their report focused on Camacho giving a drink to another youth.

46. Jones and Foster substantiated a separate boundaries violation by Camacho involving a drink given to another youth but closed the allegation of sexual misconduct as to Carmello. They did so despite the specific report identifying Carmello, the observations of unusual closeness and time together, the gifts, and Camacho's admitted access to him. They did not take any protective measure to prevent further private or sexual contact with Carmello.

47. Jones knew from his own earlier investigation that Camacho had previously been accused of sexual activity with a youth. He also knew from his investigation of Fewkes that Carmello had previously reported sexual touching by a staff member. Foster personally reviewed the February evidence identifying Carmello as the youth at risk. Each recognized the substantial danger presented by the reported sexual relationship and disregarded it by closing the matter without effective protection.

**F. Camacho Continued Sexually Exploiting Carmello in March 2025**

48. Camacho used the telephone to continue the sexual exploitation. She sent Carmello sexually explicit photographs and videos of herself, engaged in sexual conduct during video calls, and solicited photographs of his penis. Before beginning her disciplinary suspension in March 2025 for the drink-sharing involving another youth, she supplied the telephone to Carmello so that she could maintain contact with him while she was away from the facility.

49. Camacho made 12 FaceTime calls to the telephone between March 19 and March 21, 2025. She sent Carmello multiple videos of herself masturbating, including four videos dated March 21 between 9:58 and 10:34 that evening.

50. Camacho reinforced Carmello's emotional dependence through messages linking her well-being to their relationship. In messages beginning March 25, 2025, she wrote: "I won't be happy without you, I would be fucking broken," and said she was "done" if their relationship did not work out. She called Carmello her "future hubby" and asked: "You moving in with me? Like right after you leave there?"

51. Camacho remained able to communicate with and exploit Carmello. Her sexually explicit communications continued in March, after Jones and Foster had closed the investigation. Their failure to protect Carmello allowed the abuse to continue.

### G. Officials Found Explicit Evidence but Still Failed to Protect Carmello or Disclose It to the Juvenile Court

52. On March 26, 2025, staff found a contraband telephone used by Carmello and other youths. It contained explicit material and communications with Camacho. That evening, Youth Security Supervisor Manager Jason White personally notified Jones, Krolikowski, and LaBouchardiere of the explicit content. By March 27, Kearney officials were communicating with the Nebraska State Patrol about the telephone's contents. LaBouchardiere informed the Deputy Ombudsman for Institutions that a telephone had been discovered but did not disclose its sexual content.

53. After the telephone was discovered, Carmello tried to tell staff about his relationship with Camacho. Staff told him that he was being manipulative and placed him in confinement in the Dickson unit.

54. An April 1, 2025 notice to Camacho described the sexually explicit videos and her messages to Carmello, including her references to living together after his release. The notice identified 42 pages of messages and other evidence supporting disciplinary charges. Camacho resigned on April 2, 2025.

55. The officials did not disclose the evidence of Camacho's sexual abuse of Carmello to his probation officer, his legal representatives, or the juvenile court at his July 2025 review hearing. Their failure left the people responsible for his placement unable to respond to that evidence. Carmello remained at Kearney through September 2025.

56. Camacho's contact with Carmello continued even after her departure from the facility. She continued communicating with him by letters and telephone while he remained detained. Carmello recognized her letters by a nickname she had given him at the facility. In September 2025, staff reported that she was using another name in correspondence. Krolikowski and Jones received a report and mail-log information identifying that continuing contact.

57. The incident review identifying Krolikowski and Jones as the reviewing officials classified the explicit phone evidence as "Staff-to-Youth Inappropriate Boundaries." Jones submitted the review on September 24, 2025. It identified no opportunities for improvement and stated that the incident "does not indicate a need to change policy or practice to better prevent, detect or respond to sexual abuse."

58. After an emergency hearing, the juvenile court entered an order on September 30, 2025 addressing the March telephone discovery and the April notice. The court found: "None of this information was disclosed to probation. None of this information was provided to the legal parties. None of this information was provided to the Court at a YRTC Review hearing for this youth in July of 2025."

59. The court described being "disgusted and disturbed" by the lack of transparency and ordered that Carmello not be returned to Kearney. It also ordered production of Camacho's disciplinary records and prior investigations, including investigations the facility had classified as unfounded.

60. After his removal from Kearney, Carmello had opportunities to discuss the abuse outside that institution. In a November 17, 2025 forensic interview, he disclosed Camacho's grooming, the contraband and telephone, the physical sexual acts, and her instructions about camera blind spots and hiding the telephone. He also disclosed Fewkes's sexual touching, which he had again reported to his family after leaving Kearney.

**H. Criminal Charges and the Inspector General's Findings Followed**

61. On July 17, 2026, prosecutors filed a criminal information against Camacho in Buffalo County District Court charging six felonies. The charges included first-degree sexual abuse of a protected individual, alleging sexual penetration of Carmello, and second-degree sexual abuse of a protected individual, alleging sexual contact with him. The information alleged that those offenses occurred from October 5, 2023, to April 2, 2025.

62. The Inspector General's July 27, 2026 report examined allegations at Kearney from March 2025 through March 2026. It documented 44 allegations of sexual abuse and related misconduct, involving 37 youths and 19 staff members. Four staff members, including Camacho and Fewkes, had been criminally charged. Fewkes's prosecution concerned sexual abuse of another youth.

63. The Inspector General found that at least 11 of the 19 identified staff members had previously been written up, verbally counseled, placed on disciplinary probation, or named by youths in allegations of sexual abuse or inappropriate boundaries. The report traced recurring

problems with staff boundaries and responses to sexual misconduct to the State's own assessments dating to 2016.

64. The Inspector General also documented a 2022 allegation against Fewkes. A youth accused her of touching him first and trying to initiate a relationship with him. Compliance classified his allegation as unfounded and described him as "a victimizer blaming the victim of their actions." The report identified the similarity between that earlier allegation, Carmello's report of sexual touching through his cell door, and the conduct that later resulted in criminal charges against Fewkes.

65. The report described repeated failures to treat sexual conduct between adult staff and detained youths as abuse, including a tendency to blame youths for the conduct. It concluded that the culture at Kearney "normalized inappropriate staff behavior, which the facility failed to sufficiently address."

66. The specific reports to Krolikowski, LaBouchardiere, Fortner, Jones, and Foster gave each actual notice of dangers within that culture. Each had time and authority, through facility administration or the investigation and compliance process, to take protective action. Each disregarded the known risk described above and left Carmello exposed to Camacho's continued abuse. Their own acts and omissions caused the constitutional injuries alleged here.

## COUNT I

### Sexual Abuse and Deprivation of Bodily Integrity
### 42 U.S.C. § 1983 — Camacho and Fewkes
### Fourteenth Amendment; Eighth Amendment in the Alternative

67. Plaintiff incorporates the preceding factual allegations.

68. Plaintiff had a clearly established constitutional right to bodily integrity and to be free from sexual assault by officials exercising custodial authority over him. The Fourteenth

Amendment protects that right. *See Rogers v. City of Little Rock*, 152 F.3d 790, 795–98 (8th Cir. 1998).

69. Camacho and Fewkes each intentionally subjected Plaintiff to the sexual acts alleged above while using the authority and access conferred by their state employment. Their abuse of a detained child for sexual gratification was arbitrary, conscience-shocking conduct unrelated to any legitimate governmental objective. Each deprived Plaintiff of bodily integrity and substantive due process.

70. In the alternative, Plaintiff asserts the same claim under the Eighth Amendment, as applied to the States through the Fourteenth Amendment. The sexual abuse constituted the unnecessary and wanton infliction of pain and cruel and unusual punishment. Camacho and Fewkes acted intentionally for sexual gratification and with conscious disregard for Plaintiff's safety and rights.

71. Each Defendant's conduct directly and proximately caused Plaintiff's injuries and entitles him to the relief requested below.

**COUNT II**

**Deliberate Indifference to Sexual Abuse and Failure to Protect**
**42 U.S.C. § 1983 — Krolikowski, LaBouchardiere, Fortner, Jones, and Foster**
**Fourteenth Amendment; Eighth Amendment in the Alternative**

72. Plaintiff incorporates the preceding factual allegations.

73. Plaintiff had a clearly established right to protection against a substantial risk of sexual assault by custodial staff. Officials who know of that risk and deliberately disregard it violate the Constitution. *See Kahle v. Leonard*, 477 F.3d 544, 550–54 (8th Cir. 2007), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

74. Krolikowski, LaBouchardiere, Fortner, Jones, and Foster each knew of and deliberately disregarded a substantial risk that Plaintiff would be sexually abused. Their

knowledge arose from their personal receipt, investigation, or review of the specific warnings alleged above. Their liability rests on their own decisions and failures to act, including their continued allowance of access to Plaintiff without effective protective measures after learning of that risk.

75. Krolikowski and LaBouchardiere failed to exercise their administrative authority to protect Plaintiff after receiving the identified reports. Fortner and Jones approved the closure of the 2023 Camacho investigation without effective continuing safeguards. Jones and Foster closed the February 2025 allegation identifying Plaintiff despite the specific evidence of sexual misconduct, grooming, and opportunity. These acts and omissions allowed Camacho's abuse of Plaintiff to continue.

76. Each Defendant had the opportunity to deliberate and take protective action. Each consciously disregarded the serious danger to Plaintiff. Their deliberate indifference violated his Fourteenth Amendment rights to bodily integrity and reasonable safety in state custody. In the alternative, the same conduct violated his Eighth Amendment right to be free from cruel and unusual punishment.

77. Each Defendant's deliberate indifference directly and proximately caused the further abuse and resulting injuries that reasonable protective action would have prevented. Plaintiff seeks damages from each for the injuries caused by that Defendant's own conduct.

**DAMAGES**

78. The sexual abuse and the deliberate failure to protect Plaintiff caused serious psychological injury, emotional distress, humiliation, fear, loss of trust, and loss of enjoyment of life. The harm continued after the sexual acts ended and after his release from custody.

79. Plaintiff seeks compensation for all past and future injuries caused by Defendants, including the reasonable cost of treatment for the resulting trauma. The amount will be established at trial.

80. Defendants acted intentionally or with reckless or callous indifference to Plaintiff's federally protected rights. Their conduct warrants punitive damages against them individually.

**JURY DEMAND**

81. Plaintiff demands a trial by jury on all issues triable to a jury.

**PRAYER FOR RELIEF**

Plaintiff requests judgment in his favor and against Defendants, awarding:

A. Compensatory damages in an amount to be determined at trial, with joint and several liability to the extent permitted by law;

B. Punitive damages against each Defendant in an amount sufficient to punish and deter the conduct proved at trial;

C. Nominal damages for any constitutional violation for which compensatory damages are not awarded;

D. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

E. Prejudgment and postjudgment interest as permitted by law; and

F. Such other relief as the Court deems just and proper.

Dated: October 1, 2026

Respectfully submitted,

/s/ Ross Pesek

Ross Pesek, #24636
Daniel C. Martin, #27218
**PESEK LAW LLC**
4826 S. 24th Street
Omaha, NE 68107
Tel.: (402) 342-9684
Fax: (402) 342-9683
ross@peseklaw.com
daniel@peseklaw.com

Jakob Z. Norman
Andrew T. Tutt
Regina Powers
Ansley O'Brien*
Kelly Jo Popkin
R. Stanton Jones
**TRIAL LAWYERS FOR JUSTICE**
421 W. Water Street
Decorah, IA 52101
Tel.: (866) 854-5529
jakob@tl4j.com
andrew@tl4j.com
regina@tl4j.com
ansley@tl4j.com
kellyj@tl4j.com
stanton@tl4j.com

*Attorneys for Plaintiff Carmello D. Wells*

*Application for admission pending